IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION Nos. |
| | ) | |
| V. | ) | 1:20-CR-126-LMM; |
| | ) | 1:23-CR-290-LMM |
| | ) | |
| THOMAS ADDAQUAY | ) | |
| | ) | |

## SENTENCING MEMORANDUM

Comes now, Thomas Addaquay, by and through undersigned counsel, and submits this sentencing memorandum for the Court's consideration as it determines a reasonable sentence for Mr. Addaquay.

### I.    Procedural History

Mr. Addaquay is being sentenced on two cases: case number 1:20-CR-126, in which he was convicted by a jury of 1 count of conspiracy to commit wire fraud (18 U.S.C. § 1349), 10 counts of wire fraud (§ 1343), 5 counts of aggravated identity theft (§ 1028A), 1 count of money laundering conspiracy (§ 1956(h)), and 12 counts of money laundering (§ 1957); and case number 1:23-CR-290, in which Mr. Addaquay pleaded guilty to an information charging him with 1 count of structuring transactions to evade reporting requirements (31 U.S.C. §§ 5324(a)(1) and 5324(d)).    Mr. Addqauay's

sentencing on all counts is scheduled for January 22, 2024.

II.  <u>Sentencing Guidelines</u>

The PSR calculates Mr. Addaquay's guideline range as follows. The guideline applications that Mr. Addaquay has objected to are italicized.

**<u>Group A: Case number 1:20-cr-126</u>**

**Subgroup 1: Wire Fraud**

| Guideline Provision | Description | Points |
|---|---|---|
| U.S.S.G. § 2B1.1 | Base Offense Level | 7 |
| *U.S.S.G. § 2B.1(b)(1)(J)* | *Loss amount of $13,785,093.67* | +20 |
| U.S.S.G. § 2B1.1(b)(2)(A)(i) | 10 or more victims | +2 |
| *U.S.S.G § 2B1.1(b)(10)(C)* | *Sophisticated means* | +2 |
| U.S.S.G § 3B1.1(a) | Leadership role | +4 |
| *U.S.S.G § 3C1.1* | *Obstruction of justice* | +2 |
|  | *Total Offense Level* | *37* |

**Subgroup 2: Money Laundering**

| Guideline Provision | Description | Offense Level |
|---|---|---|
| *U.S.S.G. § 2S1.1(a)(1)* | *Base Offense Level* | *31* |
| U.S.S.G. § 2S1.1(b)(2)(A) | § 1957 conviction | +1 |
| *U.S.S.G § 3B1.1(a)* | *Leadership role* | *+4* |
| *U.S.S.G § 3C1.1* | *Obstruction of justice* | *+2* |
|  | *Total Offense Level* | *38* |

**Group B: Case number 1:23-cr-290**

| Guideline Provision | Description | Offense Level |
|---|---|---|
| U.S.S.G. § 2S1.3 | Base Offense Level for $550,000 to $1,500,000 in structured funds | 20 |
| U.S.S.G. § 2S1.3(b)(1) | Proceeds of unlawful activity | +2 |
| U.S.S.G. § 2S1.3(b)(2) | Pattern of unlawful activity | +2 |
| *U.S.S.G. § 3B1.1(c)* | *Role* | +2 |
| | *Total Offense Level* | *26* |

Pursuant to U.S.S.G. § 3D1.4, no levels are added because Group B is more than 8 levels lower than Group A. Accordingly, the combined offense level is that of the highest group, 38. The combined adjusted offense level is reduced by 3, pursuant to § 3E1.1, for acceptance of responsibility, for a total offense level of 35.

For the aggravated identity theft counts, the mandatory term of imprisonment is 2 years consecutive to any other sentence. These counts may run concurrently to one another.

     i.   <u>Mr. Addaquay objects to the facts alleged in the PSR in the specific paragraphs noted in his objections.</u>

Mr. Addaquay maintains his innocence as to the charges in 1:20-CR-126, and he therefore objects to any claim that he was involved in illegally

acquiring any person's personal identifying information, the preparation of any fraudulent tax returns, or the acquisition of any fraudulent refund anticipation loans/checks or other tax refunds, or that he was otherwise involved in any illegal or fraudulent conduct related to tax preparation and/or check cashing. He further objects to any claim that he was involved in money laundering. As such, Mr. Addaquay objects to the specific factual paragraphs listed in his objections to the PSR.

Mr. Addaquay also objects to the reliance on information provided in interviews that was not testified to at trial. "When the government seeks to apply an enhancement under the Sentencing Guidelines over a defendant's factual objection, it has the burden of introducing *sufficient and reliable evidence* to prove the necessary facts by a preponderance of the evidence." *United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013) (quotation omitted; emphasis added). A district court may rely on hearsay evidence only if "the evidence has sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence." *See United States v. Anderton*, 136 F.3d 747, 751 (11th Cir. 1998); Fed.R.Evid. 801(c).

While Mr. Addaquay understands that the Court may credit evidence

or testimony presented at trial that supports the factual statements in the PSR, the PSR primarily relies on pre-trial interviews of various witnesses, and many of those statements were not offered at trial. Thus, this Court may not rely on this evidence unless the government can prove that it is sufficiently reliable and the Court finds that it is credible.

    ii.    <u>Mr. Addaquay objects to the amount of loss in Group A.</u>

The PSR attributes to Mr. Addaquay a total loss amount of $13,785,093.67. This amount includes $13,191,634.72 from case number 1:20-cr-126, and $593,458.95 from "the business email compromise scheme" which is apparently the underlying unlawful activity for the structuring conviction in case number 1:23-cr-290. Mr. Addaquay objects to this loss amount for the reasons articulated below and in his objections to the initial PSR.

    a.  <u>The loss amount should not include any amount from the "business email compromise scheme."</u>

Mr. Addaquay objects to any loss amount from 1:23-CR-290 being included in the loss amount for Group A because the structuring count forms its own group. U.S.S.G. § 3D1.1 provides that, when a defendant has been convicted of more than one count, the court shall group the counts "into distinct Groups of Closely Related Counts" and "[d]etermine the offense

level applicable to each Group." Because the probation officer correctly determined that the structuring count forms its own group, no loss amount from the structuring group (Group B) should be used to determine the offense level applicable to the other group (Group A, the wire fraud and money laundering group).

Indeed, the probation officer's response to the government's objection to the loss amount agrees that "the loss amount related to the structuring case should not be combined with the wire fraud case as the structuring count has its own guideline calculations." (PSR at ¶ 181). Yet the PSR still incorrectly applies $593,458.95 for the "business email compromise scheme" related to the structuring count. As such, the loss amount in the PSR should be reduced by $593,458.95.

     b. <u>The loss amount should not be the total amount of all the checks processed by Reliafund into United Consolidated accounts.</u>

If the defendant objects, the government must prove its loss calculation by a preponderance using "reliable and specific evidence." *United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997). Here, the PSR holds Mr. Addaquay accountable for all 4,198 checks processed by Reliafund into United Consolidated accounts, apparently concluding that every single

check cashed by Reliafund was fraudulent.  But the government has not produced "reliable and specific" evidence supporting that conclusion, and therefore, this Court cannot apply that loss amount.

At trial, the government presented evidence regarding only 12 tax payer victims. (*See* PSR at ¶ 42).  The Court cannot conclude from evidence regarding only 12 tax returns that all 4,198 checks were the result of fraud that Mr. Addaquay knew about or participated in. "[W]here properly performed[,] a statistical estimate may provide a sufficient basis for calculating the amount of loss caused by a defendant." *United States v. Annamalai*, 939 F.3d 1216, 1237 (11th Cir. 2019) (cleaned up). But the Court cannot rely on "inferential leap" or "too much speculation." *Id.* at 1237-38.

In *Annamalai*, the Eleventh Circuit deemed "the inferential leap from 85 documented files" to the conclusion at all 467 files involved fraud was "a step too far." *Id.* at 1237; *see also United States v. Jenkins*, 701 F. App'x 897, 902 (11th Cir. 2017) (where government established at trial that 16 returns were fraudulent, court could not rely on evidence of similarities that did not necessarily indicate fraud to determine 228 other returns were also fraudulent).  Here, the PSR goes beyond the inferential leaps that the Eleventh Circuit rejected in *Annamalai* and *Jenkins*, and makes a significantly

larger leap from 12 to 4,198. There is too much speculation in the PSR's analysis for the Court to agree to the loss amount calculation.

Based on its assumption that all 4,198 checks processed by Reliafund involved fraud, as well as other statements suggesting that Mr. Addaquay only "pretended" to operate a check cashing business, the Probation Officer has apparently concluded that Mr. Addaquay had no legitimate business. This conclusion is untrue and is not supported by the record. There are several statements in the PSR, as well as evidence from trial, showing that Mr. Addaquay acquired and cashed checks legitimately. First, Mr. Addaquay bought an existing check cashing business, and there is no evidence or allegation that the pre-existing business was engaged in fraud. (*See* PSR at ¶ 77). Mr. Addaquay had what Benjamin Grover deemed an "impressive" buildout at his storefront, and Grover estimated that there were 10 to 20 customers per day at that store. (PSR at ¶ 9). Additionally, much of the money in the United Consolidated accounts listed in the PSR was withdrawn in cash, which is consistent with a check-cashing business.

Thus, the Court cannot conclude that Mr. Addaquay operated a "total fraud" such that any check sent to Reliafund must have been obtained illegally. *See Annamalai*, 939 F.3d at 1238 (rejecting the district court's

conclusion that the defendant "operated a total fraud," so that "every penny" that ever came into the Hindu Temple "should be included in computing the loss" because a few followers testified that they "received some genuine religious services").

In sum, it has not been proven that all of the funds processed by Reliafund into United Consolidated accounts were (1) the result of checks that involved fraud, or (2) that Mr. Addaquay aided and abetted, or was even aware of, any fraud or illegal activity involved in the acquisition of all of the checks. Nor has the government produced a statistical estimate that provides a basis for calculating this amount of loss. Consequently, this Court must reject the loss amount in the PSR.

Instead, Mr. Addaquay submits that the loss amount should be the total amount of the tax returns for which evidence was presented at trial, $82,575 (Hill: $9,710; Bradley: $2,668; Maggio: $9,254; Nelson: $2,509; Knowles: $5,279; Browning: $9,655; Jackson: $6,939; Stubbs: $9,984; Braida: $9,377; Casiano: $6,764; Armfield: $4,934; McLoyd: $5,502). This loss amount would yield a 6-level increase under § 2B1.1.

iii.  <u>Mr. Addaquay objects to the two-point enhancement for sophisticated means in the wire fraud calculations.</u>

Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), two points are added if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  Application Note 9 provides that;

> "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1(b)(10)(C), Application Note 9.

Here, the PSR states that the wire fraud scheme was especially complex and extensive because Mr. Addaquay obtained stolen PII of real taxpayers, used that information to prepare tax returns, used a rapid refund service to direct the refunds to accounts he had control over, opened checking accounts to launder funds, and "pretended" to operate a check cashing business. (PSR at ¶ 183).  However, the guideline states that Mr. Addaquay is responsible only for the conduct "that *the defendant*

intentionally engaged in or caused." U.S.S.G. § 2B1.1(b)(10)(C).[1]

Here, as discussed above in the section regarding the loss amount, there has been no showing that Mr. Addaquay was involved in any conduct that was particularly sophisticated. First, Mr. Addaquay denies that he "pretended" to operate a check cashing business, as the trial evidence shows that he purchased an existing business, built out storefronts to be check cashing locations, and had actual visitors to the check cashing location. While pretending to operate a business may in some cases justify a sophisticated means enhancement, there is no basis in the record to conclude that Mr. Addaquay only pretended to operate a business. The PSR's reliance on the suggestion that Mr. Addaquay opened bank accounts solely to launder funds is also unfounded, given that Mr. Addaquay had bank accounts for the purposes of operating United Consolidated.

Second, the PSR relies on conduct that is the basis of almost every tax fraud case to apply the sophisticated means enhancement: using PII to file false tax returns. Moreover, in any fraud case, there are steps taken to direct

---

[1] This clause was added in 2015 and was intended to correct cases in which courts had found that the enhancement applied regardless of whether the defendant's own conduct was sophisticated. *See* U.S.S.G. § 2B1.1, 2015 Amendments at p. 25, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20150430_RF_Amendments.pdf (last accessed Jan. 17, 2024).

the funds to the control of the perpetrator, such that directing the funds to accounts that he controlled is insufficient to sustain the enhancement. As the Commentary notes, the conduct must be "especially complex or especially intricate" to sustain the enhancement, but here, even if the conduct was complex or intricate, it was not especially so. Therefore, this Court should sustain Mr. Addaquay's objection.

    iv.   <u>Mr. Addaquay objects to the enhancements for obstruction of justice in Group A.</u>

Based on the government's objection, the PSR applies a two-point enhancement for obstruction of justice because Mr. Addaquay allegedly instructed codefendant Sacoya Lyons not to cooperate with the government. (PSR at ¶ 186). Specifically, according to the PSR, Mr. Addaquay paid for Lyons' lawyer, with whom he had a long relationship, when Lyons was arrested for DUI; that lawyer advised Lyons not to talk and not to take advantage of any proffer meetings when she later received a target letter regarding the instant offense; and Mr. Addaquay told Lyons that she should be quiet and he and his attorneys would get her out of the case and Lyons listened to that advice until she got new counsel. (*Id.*) Even if established, none of these facts support the § 3C1.1 enhancement.

U.S.S.C. § 3C1.1 provides for a two-level enhancement if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense. Application Note 4 provides the following examples of covered conduct:

(A)     threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;

(B)     committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction;

(C)     producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding;

(D)     destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so; however, if such conduct occurred contemporaneously with arrest (e.g., attempting to swallow or throw away a controlled substance), it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it resulted in a material hindrance to the official investigation or

prosecution of the instant offense or the sentencing of the offender;

(E)   escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding;

(F)   providing materially false information to a judge or magistrate judge;

(G)   providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense;

(H)   providing materially false information to a probation officer in respect to a presentence or other investigation for the court;

(I)   other conduct prohibited by obstruction of justice provisions under title 18, United States Code (e.g., 18 U.S.C. §§ 1510 [bribery], 1511 [with intent to facilitate an illegal gambling business]);

(J)   failing to comply with a restraining order or injunction issued pursuant to 21 U.S.C. § 853(e) or with an order to repatriate property issued pursuant to 21 U.S.C. § 853(p);

(K)   threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction.

The alleged conduct here clearly is not covered by the guideline.  First, Mr. Addaquay is not responsible for any advice that an attorney gave to Ms. Lyons. There has been no showing that Mr. Addaquay instructed the attorney to give that advice or that the attorney would not have given the same advice if he had not been referred by Mr. Addaquay. Nor is there any

evidence or allegation that Mr. Addaquay paid for the lawyer to represent her on anything other than her DUI arrest. Finally, there is no evidence that Mr. Addaquay paid for the lawyer for the DUI arrest in an attempt to conceal his own activities, rather than simply because he was in a relationship with Ms. Lyons at the time.  As such, Mr. Addaquay is not responsible for the advice or actions of that attorney.

As to Mr. Addaquay's own alleged actions, simply telling a potential codefendant that she should not cooperate and should be quiet does not constitute obstruction of justice for purposes of the guidelines. Advising Ms. Lyons that she should not *help* with the investigation is not the same as instructing her to *obstruct* or *impede* the investigation. There's no allegation that Mr. Addaquay threatened, intimidated, or otherwise *unlawfully* influenced Lyons by telling her she should not cooperate and speak with the government.  The guideline specifically requires threats, intimidation, or unlawful influence. But here the allegation is not that Mr. Addaquay threatened or intimidated Ms. Lyons.

Nor is there any allegation as to how any of the alleged advice constituted unlawful influence.  "Unlawful influence," for purpose of the guideline, obviously requires that the influence be prohibited by law, but

also, pursuant to the *ejusdem generis* canon of statutory interpretation, it requires conduct similar to threats or intimidation. *Yates v. United States,* 574 U.S. 528, 545 (2015) ("Where general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words" (cleaned up)). Thus, the conduct described does not rise to the level of unlawful influence for both reasons.

Indeed, this conduct is far less serious than conduct that the Eleventh Circuit has found to support this enhancement. *See, e.g., United States v. Douglas*, 784 F. App'x 676, 681 (11th Cir. 2019) (defendant posted "aggressive" comments on codefendant's social media intended to expose and shame him as a "rat" and also sent copies of the codefendant's DEA interview to a drug dealer); *United States v. Griffin*, 724 F. App'x 808, 811 (11th Cir. 2018) (defendant was responsible for codefendant writing a false affidavit retracting information he provided to the government about the defendant); *United States v. McDonald*, 497 F. App'x 878, 880 (11th Cir. 2012) (defendant sent U.S. Attorney a signed, notarized letter with materially false statements about a codefendant's culpability).

Accordingly, this Court should not apply an enhancement for obstruction of justice to either the wire fraud subgroup or the money laundering subgroup.

v.  Mr. Addaquay objects to the role enhancement in the money laundering subgroup.

The PSR applies the four-point role enhancement pursuant to U.S.S.G. § 3B1.1(a) in the money laundering guideline calculations. This enhancement applies "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. The money laundering guideline, 2S1.1, in Application Note 2(C), provides that "Notwithstanding §1B1.5(c), in cases in which subsection (a)(1) applies, application of any Chapter Three adjustment shall be determined based on the offense covered by this guideline (i.e., the laundering of criminally derived funds) and not on the underlying offense from which the laundered funds were derived."

Here, 2S1.1(a)(1) applies, so the enhancement must be determined based on the laundering of the funds, and not the underlying offense. However, the PSR states that

> The defendant orchestrated an extensive and complex scheme to defraud by obtaining stolen PII of real taxpayers and filing their income tax returns and had the funds deposited into accounts he

had control over. The defendant recruited individuals, such as Lyons, to open bank accounts and sign checks so the refund checks could be deposited. The defendant also directed his brother, Nana, to create businesses so bank accounts could be opened in those names. At the direction of Thomas, Nana also opened bank accounts in the names of those businesses. The defendant also had co-conspirator Michael Awiti prepare tax returns using the fraudulent PII and co-conspirator Kevin Edwards cash checks. Thus, the defendant was an organizer or leader in the laundering of the money generated through his criminal activity.

(PSR at ¶ 191).

Much of the activity described in the PSR relates to the wire fraud conspiracy, not the money laundering. There has been no showing that Awiti and Edwards were involved in the money laundering scheme. And activities related to wire fraud conspiracy cannot be the basis of the enhancement because the Guidelines specify that any Chapter 3 enhancements must be based on the laundering, and not on the underlying offense from which the laundered funds were derived. U.S.S.G. § 2S1.1, Application Note 2(C). Because only Mr. Addaquay, Nana Addaquay, and arguably, Sacoya Lyons, played any role in the money laundering activity, there are not five or more participants. Nor was the money laundering scheme otherwise extensive. As such, the four-point enhancement should not apply.

vi.   <u>Mr. Addaquay objects to the role enhancement in Group B.</u>

The PSR applies a two-point role enhancement based on its conclusion that Mr. Addaquay "recruited Karaboni and directed her to register false businesses on the Georgia Secretary of State website and also instructed her to open bank accounts so fraudulent funds could be deposited into the account." (PSR at ¶ 198). However, the only evidence that Mr. Addaquay "directed" or "instructed" Karaboni to do anything is Karaboni's own statements during her proffer session. (*See* PSR ¶¶ 159-171). This proffer session was part of Karaboni's cooperation agreement and the statement was given prior to her sentencing. (*See* doc. 159-1 at 7-8). She thus had a motive to minimize her own conduct and cast the blame on Mr. Addaquay. Indeed, Mr. Addaquay understands that blaming him for her actions was one of the themes of Karoboni's sentencing argument.

Mr. Addaquay submits that Karaboni's statements that were given in an attempt to gain the favor of the government, minimize her own role, and reduce her ultimate sentence, are not credible evidence that this Court can rely on. The objective evidence, on the other hand, shows that Karaboni was the registered agent of the sham company involved, she opened the check account *and was the only signatory on the account*, and she made cash

withdrawals from the account. (PSR at ¶¶ 160-62). While there were some cashier's checks payable to Mr. Addaquay from the account, Karaboni was able to pay herself in cash because she was the only signatory on the account. Thus, setting aside Karaboni's biased statements, the evidence indicates that it was she who had control of the proceeds and their distribution. As such, no role enhancement should be applied to Mr. Addaquay.

vii. <u>Mr. Addaquay's criminal history category should be I because the conviction in paragraph 214 has been vacated.</u>

The PSR applies one criminal history point based on a 2011 Gwinnett County first offender conviction. (PSR at ¶ 214). However, this conviction was vacated in July of 2015 after the Gwinnett Court granted Mr. Addaquay's petition for writ of habeas corpus. (*See* Attachment 1). As such, there is no conviction, and Mr. Addaquay cannot receive a criminal history point. With this criminal history point removed, Mr. Addaquay has only one criminal history point, and his criminal category is I.[2]

---

[2] Mr. Addaquay did not object to this issue in the PSR, but will provide a certified copy of the order at the sentencing hearing. Fed. R. Crim. P. 32(i)(1)(D) allows the Court to consider an objection made any time before sentencing, and Mr. Addaquay submits that the Court should consider the objection at this time in order for the guidelines to be properly calculated.

     viii.   <u>Based on the above, Mr. Addaquay's guideline sentencing range is 41 to 51 months, plus 24 months for the aggravated identity theft counts.</u>

If Mr. Addaquay's objections are sustained, his guidelines will be as follows:

## **Group A: Case number 1:20-cr-126**

## **Subgroup 1: Wire Fraud**

| Guideline Provision | Description | Points |
|---|---|---|
| U.S.S.G. § 2B1.1 | Base Offense Level | 7 |
| U.S.S.G. § 2B.1(b)(1)(D) | Loss amount of $82,575 | +6 |
| U.S.S.G. § 2B1.1(b)(2)(A)(i) | 10 or more victims | +2 |
| U.S.S.G. §3B1.1 | Role | +4 |
| | Total Offense Level | 19 |

## **Subgroup 2: Money Laundering**

| Guideline Provision | Description | Offense Level |
|---|---|---|
| U.S.S.G. § 2S1.1(a)(1) | Base Offense Level | 15 |
| U.S.S.G. § 2S1.1(b)(2)(A) | § 1957 conviction | +1 |
| | Total Offense Level | 16 |

**Group B: Case number 1:23-cr-290**

| Guideline Provision | Description | Offense Level |
|---|---|---|
| U.S.S.G. § 2S1.3 | Base Offense Level for $550,000 to $1,500,000 in structured funds | 20 |
| U.S.S.G. § 2S1.3(b)(1) | Proceeds of unlawful activity | +2 |
| U.S.S.G. § 2S1.3(b)(2) | Pattern of unlawful activity | +2 |
| | Total Offense Level | 24 |

Pursuant to U.S.S.G. § 3D1.4, there are 1.5 units (.5 for Group A and 1 for Group B), and therefore, 1 level is added. Accordingly, the combined offense level is that of the highest group plus 1, which is 25. The combined adjusted offense level is reduced by 3, pursuant to § 3E1.1, for acceptance of responsibility, for a total offense level of 22. With the criminal history category of I, this yields a guideline range of 41 to 51 months. For the aggravated identity theft counts, the mandatory term of imprisonment is 24 months consecutive to any other sentence. These counts may run concurrently to one another.

### III.   The 18 U.S.C. § 3553(a) factors.

Mr. Addaquay urges the Court to impose a sentence that is sufficient *but not greater than necessary* upon consideration of the § 3553(a) factors, and

submits that a total sentence of 60 months—which would include the 24 months on the aggravated identity theft counts—is reasonable here. This Court is familiar with the applicable factors:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;
(2) The need for the sentence imposed
    a. To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    b. To afford adequate deterrence to criminal conduct;
    c. To protect the public from further crimes of the defendant;
    d. To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) The kinds of sentences available;
(4) the guideline range;
(5) any pertinent policy statements; and
(6) the need to avoid unwarranted sentence disparities.

18 U.S.C. § 3553(a)(1-4).

i. <u>The history and characteristics of the defendant.</u>

As the Court can see from the letters attached to this memorandum, (Attachment 3), Mr. Addaquay has the support of his mother, siblings, in-laws, and friends. Mr. Addaquay has been a "pillar of support" for the entire family, despite being geographically distant. They describe in glowing terms his strong bond with his 13-year old son, Thomas Jr., his friendly and welcoming nature, and his devotion to charitable causes. The entire family

hopes that Mr. Addaquay will be able to see his 73-year-old mother again once his term of imprisonment ends.

Mr. Addaquay hopes that this Court will impose a term of imprisonment that is not greater than necessary so that he can be reunited with his son. Mr. Addaquay knows that the teenage years in a particular are a time when his son will the guidance of his father. He regrets that his conduct has caused him to be separated from his son.

Finally, Mr. Addaquay notes that, in this case, he has attempted to assist the government with the investigation and prosecution of others following his guilty plea in case number 1:23-cr-290. Mr. Addaquay debriefed with the government and provided truthful information in his attempt to aid the government, although it did not rise to the level of qualifying for a U.S.S.G. § 5K1.1 reduction.

ii.    <u>The need for the sentence imposed to promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public.</u>

A 60-month sentence is sufficient to meet the objectives stated in § 3553(a)(2). A term of imprisonment of 5 years is a significant sentence and provides adequate punishment for Mr. Addaquay's proven conduct in both cases. Indeed, it is clear that other courts agree that such a sentence is

sufficient to promote respect for the law and afford adequate deterrence to others considering engaging in fraud related crimes, as 91.8% of defendants convicted of fraud crimes in the United States in 2022, and 88.2% of such defendants in this District, received a sentence of less than 5 years. (*See* Attachment 2, United States Sentencing Commission data analysis).

A 60-month term is also sufficient to protect the public. Mr. Addaquay was convicted of crimes that took place between 2012 and April of 2017. He was not indicted until 2020, and he remained on bond until October of 2022. Thus, Mr. Addaquay has demonstrated that he is not a continuing threat, and there is no need to extend his term of imprisonment to protect the public from his actions.

iii. <u>The need to avoid unwarranted sentencing disparities.</u>

As noted above, the vast majority of defendants convicted of fraud related crimes receive a sentence of 60 months of less. Notably, in 2022, only 1.7% of defendants nationally, and 1.5% of defendants in this District, received a sentence of 10 years or more. (*See* Attachment 2).

A sentence of 60 months would also avoid unwarranted disparities between his sentence and that of his codefendants. In 1:20-cr-126, Sacoya Lyons and Nana Addaquay both entered guilty pleas and received sentences

of 4 months and 24 months, respectively. In 1:23-cr-290, Clara Karabani pleaded guilty to the same charges as Mr. Addaquay and received a sentence of 4 months in custody.  Mr. Addaquay understands that his codefendants received the benefits of their respective plea agreements, but his requested sentence of 2.5 times the greatest of those sentences adequately accounts for that difference.

IV.   Conclusion

Mr. Addaquay respectfully requests that the Court consider this memorandum, as well as the evidence and argument that will be presented at the sentencing hearing, and impose a total term of incarceration of 60 months.

Respectfully submitted this 17th day of January, 2024.

/s/ *Sydney Strickland*
Sydney Strickland
Ga. Bar No. 418591

/s/ *Leigh Ann Webster*
Leigh Ann Webster
Ga. Bar No. 968087

Strickland Webster, LLC
830 Glenwood Ave SE
Suite 510-203
Atlanta, Georgia 30329
sydney@stricklandwebster.com
(404) 590-7967